**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROBERT E. HARTLINE, in his own capacity and in a representative capacity on behalf of the ERISA plan in which he is a participant or beneficiary, and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE BANK OF NEW YORK MELLON and BNY MELLON, NATIONAL ASSOCIATION,<br><br>Defendants. | Case No. 16-cv-00228<br><br>**<u>CLASS ACTION COMPLAINT</u>**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

## TABLE OF CONTENTS

I.    JURISDICTION AND VENUE ................................................................. 4

II.    PARTIES ................................................................................................. 4

    A.    Plaintiff ........................................................................................ 4

    B.    Defendants .................................................................................... 9

III.    DEFENDANTS' UNLAWFUL SCHEME .............................................. 10

    A.    Overview .................................................................................... 10

    B.    Background Regarding ADRs and ADR FX Conversions ................. 11

    C.    BNYM Has Overcharged Other Customers for FX Services; The Instant ADR FX Conversion Scheme Is Simply Another Example of A Comprehensive Course of Misconduct ........................................ 16

    D.    BNYM's ADR FX Conversion Scheme Violates ERISA and Caused Injury to Plaintiff, the Class, and the Plans ........................... 22

        1.    The Plans Are Governed by ERISA ..................................... 22

        2.    Defendants Owe Fiduciary Duties to Plaintiff, the Class, and the Plans ............................................................... 23

        3.    Causation ........................................................................ 25

        4.    Defendants' Fraud or Concealment of its ADR FX Conversion Scheme Extends the Applicable Statute of Limitations ....................................................................... 25

IV.    CLASS ALLEGATIONS ...................................................................... 26

V.    CLAIMS FOR RELIEF ........................................................................ 29

    COUNT I ........................................................................................... 29

    COUNT II .......................................................................................... 31

    COUNT III ......................................................................................... 32

VI.    JURY DEMAND ................................................................................. 34

VII.    PRAYER FOR RELIEF ................................................................................... 34

1.      Plaintiff Robert E. Hartline seeks relief for harm suffered as a result of Defendants' transactions during the Class Period (as defined below) converting into U.S. Dollars ("USD") dividends or other cash distributions, including net proceeds from the sale of non-US securities, property, or rights ("Cash Distributions"), made by foreign companies to ERISA[1] plans which are invested, directly or indirectly, in American Depositary Receipts ("ADRs") sponsored by Defendants, a process referred to in this Complaint as "ADR FX Conversions." As alleged herein, Defendants' conduct breached their ERISA-imposed duties to Plaintiff and the Class.

2.      This is a civil enforcement action brought pursuant to ERISA, 29 U.S.C. § 1132(a)(2) and (a)(3), to recover losses and obtain equitable relief to remedy Defendants' fiduciary breaches including their transactions prohibited by ERISA. It is brought for the benefit of the named Plaintiff's ERISA Plan and as a class action on behalf of the participants, beneficiaries, and named fiduciaries of that Plan and of all other similarly situated Plans (collectively the "Plans"). Defendants' ERISA fiduciary duties, the "highest known to the law,"[2] required them to act prudently and solely in the interest of the Plans' participants and beneficiaries. Rather than fulfilling these duties, the Defendants enriched themselves at the expense of the retirement security of Plaintiff and the Class.

3.      These allegations are based on counsel's investigation which included reviewing: Internal Revenue Service Forms 5500 filed with the U.S. Department of Labor ("DOL"), filings with the U.S. Securities and Exchange Commission, documents filed in actions brought by the Department of Justice and other litigation, Defendants' publicly disseminated admissions, and

---

[1] The Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq.*
[2] *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).

other publicly available documents.  The allegations are based upon personal knowledge as to

Plaintiff, and upon information and belief and the investigation of counsel as to all other matters.

## I.     JURISDICTION AND VENUE

4.     ERISA provides for exclusive federal jurisdiction over ERISA breach of fiduciary

duty claims. 29 U.S.C. § 1132(e)(1). The Plans are "employee benefit plans" within the meaning

of ERISA, 29 U.S.C. § 1002(3), and Plaintiff is a plan participant within the meaning of ERISA,

29 U.S.C. § 1002(7). Plan participants are authorized to bring actions such as this to obtain

appropriate relief for their plans. 29 U.S.C. § 1132(a)(2) and (3).

5.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1331 (federal question) and ERISA, 29 U.S.C. § 1132(e)(1).

6.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and ERISA, 29

U.S.C. § 1132(e)(2), because some or all of the fiduciary breaches for which relief is sought

occurred in this district and the Defendants reside and may be found in this district.

## II.     PARTIES

**A.     Plaintiff**

7.     Plaintiff Robert E. Hartline is a participant in the Sheet Metal Workers' National

Pension Fund, an ERISA-covered plan (the "Plan"). Mr. Hartline was a metalist by trade and

started in the Sheet Metal Workers Local 224 (now known as Local 24) in the 1970's.  Mr.

Hartline retired in 1996 and immediately started drawing his pension benefits from the Plan.  Mr.

Hartline resides in Summerfield, Florida.

8.     Plaintiff brings this action against the Bank of New York Mellon and BNY

Mellon, National Association (together, "Defendants," "BNYM" or the "Bank") in his own

capacity and in a representative capacity for the benefit of the ERISA employee benefit plan in

which he is a participant — the Sheet Metal Workers' National Pension Fund (the "Plan").

9.      Mr. Hartline also brings this action as a class action on behalf of all other similarly-situated participants, beneficiaries, and named fiduciaries of ERISA employee benefit Plans that suffered losses due to Defendants' unlawful conduct as alleged herein during the Class Period (again, collectively the "Plans"). The Class is defined as: "All participants, beneficiaries, and named fiduciaries of ERISA Plans that held Defendant-sponsored ADRs involving ADR FX Conversion transactions (a) for which Plans Defendants (or their affiliates or predecessors in interest) served as trustee or custodian of assets (including serving as trustee or custodian for Collective Investment Funds or Separately Managed Accounts in which the Plans invested); (b) for which Plans Defendants (or their affiliates or predecessors in interest) engaged in ADR FX Conversion transactions using assets of Plans; or (c) for which Plans Defendants established how much Defendants would earn from ADR FX Conversion transactions (including foreign currency transactional services provided to Collective Investment Funds or Separately Managed Accounts that held the Plans' assets), at any time from January 12, 1997 to the present. Excluded from the Class are any officers, directors, affiliates, legal representatives, heirs, successors, subsidiaries, and/or assigns of the Defendants or any of their respective predecessors in interest or any entity in which any Defendant or any of their respective predecessors in interest have a controlling interest." [3]

10.      As set forth above, the Class is limited to participants, beneficiaries, or named fiduciaries of ERISA-covered employee benefit plans. ERISA is the exclusive governing law for

---

[3] "Separately Managed Account" refers to a professionally managed investment account offered by, e.g., a broker-dealer typically for a single high net worth individual or entity in which the entity directly owns the securities in the account. "Collective Investment Funds" refers to investment vehicles, other than mutual funds governed by the Investment Company Act of 1940, that are offered for investment to more than one large institutional investor. Such funds are typically offered by banks.

private sector employee benefit plans sponsored by employers, plans sponsored by labor unions, and plans sponsored by both labor unions and employers. 29 U.S.C. § 1003(a).

11.     The Plan is an "employee pension benefit plan" under ERISA, 29 U.S.C. § 1002(2)(A). It is also a traditional defined benefit pension plan. The Plan's assets are held under the custody of the Defendants. Some assets of the Plan are managed by Thornburg Investment Management Inc. and Harding Loevner, LP, which are described in the Plan's 5500s filed with the U.S. Department of Labor as affiliates of Defendants.

12.     The Plan has been underfunded during the Class Period.  The annual reports filed on Form 5500 with the U.S. Department of Labor for years 2009 through 2014 indicate that the Plan had had insufficient assets to pay projected benefits.  The amount by which the Plan was funded and the Plan's funding status, certified by the Plan's actuary, were as follows:

| Year | Funding Percentage | Funding Status |
|------|--------------------|----------------|
| 2009 | 48.9% | Critical |
| 2010 | 58.7% | Critical |
| 2011 | 57.8% | Critical |
| 2012 | 56.8% | Critical |
| 2013 | 57.4% | Critical |
| 2014 | 59.1% | Endangered |

13.     A funding status of "critical" (also called the "red zone") is the worst plan status possible under the Pension Protection Act of 2006, Pub. L. 109–280, 120 Stat. 780. As required by law, the Plan Trustees adopted a Rehabilitation Plan to address the Plan's severe underfunding. Under the Rehabilitation Plan, the Plan permanently slashed benefits, including "permanent benefit adjustments" in the form of reduced benefit accruals; abolishing post-

6

retirement benefit increases and subsidized early retirement benefits for certain participants; and eliminating disability benefits, the 60-certain payment feature, and the reversion (pop up) feature for joint and survivor benefits for certain participants. See 2013 Schedule R Attachment to the Plan's 2013 Form 5500 – Summary of Rehabilitation Plan and Schedules. Even after these benefit cuts, the Plan was classified as "Endangered" in 2014, the second-worst rating possible.

14.     During the Class Period, Defendants or one of their predecessors in interest served as the Plan's custodian and/or trustee.

15.     The Plan held at least 66 different Defendant-sponsored ADRs during the Class Period, including:

| ADR Issue | CUSIP | SYMBOL |
|---|---|---|
| AIA GROUP LTD | 001317205 | AAGIY |
| AIR LIQUIDE SA | 009126202 | AIQUY |
| ALLIANZ SE | 01861B101 | ALGGY |
| AMERICA MOVIL SAB DE CV | 02364W105 | AMX |
| ANHEUSER BUSCH INBEV SPN ADR | 03524A108 | BUD |
| ARM HOLDINGS PLC | 042068106 | ARMH |
| ASSA ABLOY AB | 045387107 | ASAZY |
| BAIDU INC/CHINA | 056752108 | BIDU |
| BRITISH SKY BROADCASTING GROUP | 83084V106 | SKYAY |
| BURBERRY GROUP PLC | 12082W204 | BURBY |
| CARNIVAL CORP | 12082W204 | BURBY |
| CHINA MERCHANTS HOLDINGS INTER | 1694EN103 | CMHHY |
| CHINA RESOURCES ENTERPRISE LTD | 16943S104 | CRPJY |
| CIE GENERALE DES ETABLISSEMENT | 59410T106 | MGDDY |
| COCHLEAR LTD | 191459205 | CHEOY |
| COMPASS GROUP PLC | 20449X302 | CMPGY |
| CSL LTD | 12637N204 | CSLLY |
| DBS GROUP HOLDINGS LTD | 23304Y100 | DBSDY |
| DEUTSCHE BOERSE ADR | 251542106 | DBOEY |
| ELEKTA AB | 28617Y101 | EKTAY |
| ERSTE GROUP BANK AG | 296036304 | EBKDY |
| FANUC CORP | 307305102 | FANUY |
| FLSMIDTH & CO A/S | 343793105 | FLIDY |
| FRESENIUS MEDICAL CARE AG & CO | 358029106 | FMS |

| ADR Issue | CUSIP | SYMBOL |
|---|---|---|
| GLAXOSMITHKLINE | 37733W105 | GSK |
| GOLD FIELDS LTD NEW SPON ADR | 38059T106 | GFI |
| HANG LUNG PROPERTIES LTD | 41043E102 | HNLGY |
| HENNES & MAURITZ AB ADR | 425883105 | HNNMY |
| HONG KONG EXCHANGES - UNSP ADR | 43858F109 | HKXCY |
| HSBC HOLDINGS PLC | 404280406 | HSBC |
| INDUSTRIAL & COMMERCIAL BANK CHINA | 455807107 | IDCBY |
| INTESA SANPAOLO SPON ADR | 46115H107 | ISNPY |
| ITAU UNIBANCO HOLDING SA | 465562106 | ITUB |
| JGC CORP | 466140100 | JGCCY |
| KDDI CORP | 48667L106 | KDDIY |
| KOMATSU LTD | 500458401 | KMTUY |
| L OREAL CO ADR | 502117203 | LRLCY |
| LI & FUNG LTD | 501897102 | LFUGY |
| LONZA GROUP AG | 54338V101 | LZAGY |
| LVMH MOET HENNESSY LOUIS VUITTON | 502441306 | LVMUY |
| MAN GROUP PLC | 56164U107 | MNGPY |
| MITSUBISHI UFJ FINANCIAL GROUP | 606769305 | MSBHY |
| MTN GROUP LTD | 62474M108 | MTNOY |
| NATIONALBK GREECE SA SFGN ADR | 633643804 | NBGGY |
| NETEASE.COM INC SPONSORED ADR | 64110W102 | NTES |
| PEARSON PLC | 705015105 | PSO |
| PETROLEO BRASILEIRO SA | 71654V408 | PBR |
| ROYAL BANK OF SCOTLAND GROUP P | 780097689 | RBS |
| SASOL LTD | 803866300 | SSL |
| SBERBANK OF RUSSIA | 803866300 | SSL |
| SCHNEIDER ELECTRIC SA | 80687P106 | SBGSY |
| SONOVA HOLDING AG | 83569C102 | SONVY |
| SVENSKA HANDELSBANKEN AB | 86959C103 | SVNLY |
| SWATCH GROUP AG/THE | 870123106 | SWGAY |
| SYNGENTA AG | 87160A100 | SYT |
| SYSMEX CORP | 87184P109 | SSMXY |
| TENCENT HOLDINGS LTD | 88032Q109 | TCEHY |
| TEVA PHARMACEUTICAL INDUSTRIES | 88032Q109 | TCEHY |
| TOYOTA MOTOR CORP | 892331307 | TM |
| TULLOW OIL PLC | 899415202 | TUWOY |
| TURKIYE GARANTI BANKASI AS | 900148701 | TKGBY |
| UNICHARM CORP | 90460M204 | UNICY |
| VESTAS WIND SYSTEMS AIS | 925458101 | VWDRY |
| VODAFONE GROUP PLC-SP ADR | 92857W308 | VOD |

| ADR Issue | CUSIP | SYMBOL |
|---|---|---|
| WAL-MART DE MEXICO SAB DE CV | 93114W107 | WMMVY |
| XINYI GLASS HOLDINGS LTD | 98418R100 | XYIGY |

16.     Defendants' wrongful conduct as alleged herein included ADR FX Conversions for the Plan, the Plan's accounts and/or Collective Investment Funds and Separately Managed Accounts in which the Plan invested.

17.     As a direct consequence of the misconduct alleged herein, the Plan suffered financial losses and injury in fact for which Mr. Hartline seeks recovery on behalf of the Plan.

18.     As a result of these financial losses and injury suffered by the Plan, Plaintiff Hartline suffered injury in fact.

**B.     Defendants**

19.     Non-defendant The Bank of New York Mellon Corporation ("BNY Mellon Corp.") is the parent of Defendants The Bank of New York Mellon and BNY Mellon, National Association, which are its two principal subsidiaries and sources of income. BNY Mellon Corp. is a Delaware corporation with headquarters at One Wall Street, New York, New York, 10286. BNY Mellon Corp. is the product of the July 1, 2007 merger (the "Merger") of The Bank of New York Company, Inc. and Mellon Financial Corporation ("Mellon"). BNY Mellon Corp.'s website claims it had $27.9 trillion under custody or administration on September 30, 2012.

20.     Defendant The Bank of New York Mellon ("BNY Mellon"), a New York state-chartered bank. It was formerly named "The Bank of New York." Substantial overlap exists between BNY Mellon Corp's. and BNY Mellon's leadership. For instance, the BNY Mellon Corp. 2010 Form 10-K reported that every current executive officer of BNY Mellon Corp. also served as an officer of BNY Mellon. According to the BNY Mellon Corp. 2010 10-K, BNY Mellon "houses [BNY Mellon Corp.'s] institutional businesses, including Asset Servicing, Issuer

Services, Treasury Services, Broker-Dealer and Advisor Services, and the bank-advised business of Asset Management."

21.    Defendant BNY Mellon, National Association ("BNY Mellon, N.A.") is a nationally-chartered bank that was formerly named Mellon Bank, N.A. BNY Mellon, N.A. is based in Pittsburgh, Pennsylvania.

22.    As set forth above, unless otherwise specified or indicated by context, the terms "Defendants," "BNYM" or the "Bank" includes the above-named Defendants and their predecessors in interest, including pre-Merger predecessors in interest.  Substantially the same FX trading scheme alleged herein was employed by affiliates of all three entities during the class period, *i.e.*, both before and after the Merger.

23.    Defendants possess information regarding which particular entities affiliated with BNY Mellon Corp. were responsible for which conduct with respect to the Class. Plaintiff expects to refine the complaint allegations in this respect subsequent to discovery.

### III.    DEFENDANTS' UNLAWFUL SCHEME

#### A.    Overview

24.    During the Class Period, Defendants charged excessive, unauthorized, and undisclosed rates in the course of executing ADR FX Conversions with the Plans' holdings of BNYM-sponsored ADRs.  Defendants' breach of their fiduciary duty when conducting the ADR FX Conversions increased its revenues and profits by millions of dollars annually at the expense of Plaintiff, the Class, and the Plans. Defendants' parent company, BNY Mellon Corporation, stated in its 2008 annual report that "foreign exchange and other trading activities revenue totaled a record $1.5 billion in 2008 compared with $786 million in 2007." This was despite the fact that 2008 was one of the worst years of the recent financial crisis.

25.     Defendants charged excessive rates on ADR FX Conversions by employing the following scheme:  When Defendants priced the ADR FX Conversions for the Plans (or for investment funds in which the Plans invested), it selected a conversion rate for its own benefit that was far less favorable than what was available in the market or from Defendants themselves. This scheme increased Defendants' profits at the expense of their ERISA clients, which did not know and could not have known of the scheme.

26.     Defendants' "spread" on ADR FX Conversion transactions with the Plans was many times greater than what Defendants charged (and disclosed) for comparable negotiated FX transactions.

27.     *The Wall Street Journal* examined one FX trade of 8.1 million euros for USD made by Bank of New York Mellon for a large pension fund. In that trade, BNYM set the price of the FX transactions in the same manner in which they priced ADR FX Conversions – something Defendants did not disclose until more than four years later.  According to the article, the BNYM FX trader reported to that pension fund that the euro rate was $1.3610. On that day, however, euro/dollar trades occurred between $1.3704 and $1.3604. Had the trade settled at the higher end of the range of the day, $1.3704, the pension fund would have gotten an extra $76,012. *The Wall Street Journal* analyzed over 9,400 trades processed over a decade and found that 58% of the currency trades were within 10% of the day's range least favorable to the client. Carrick Mollenkamp & Tom McGinty, Inside a Battle Over Forex, The Wall St. J., May 23, 2011.

**B.     Background Regarding ADRs and ADR FX Conversions**

28.     Investors, including ERISA Plans, institutions, and others, routinely desire to invest in overseas companies in an effort to diversify their portfolios and increase their

investment returns.  Rather than purchasing foreign securities directly, these investors frequently invest in ADRs.

29.    ADRs are negotiable U.S. securities representing ownership of publicly traded shares in a non-U.S. corporation.  ADRs are purchased and sold in U.S. dollars ("USD") and provide ADR holders the benefits of being able to invest in foreign companies without the complexities and costs associated with direct ownership of foreign company shares.  Further, ADRs are subject to the protections and many of the reporting requirements provided by U.S. laws and regulations.

30.    Depositary banks, like BNYM, hold foreign securities and issue ADRs to investors on behalf of the foreign companies for which they hold securities.  The ADRs are generally issued pursuant to a prospectus, filed with the Securities Exchange Commission on Form F-6, and are governed by deposit agreements and related documents. As the depositary bank, BNYM holds shares issued by foreign companies on behalf of, and for the benefit of, U.S. ADR investors (*i.e.*, ADR holders), including the ERISA Plans.  The ADR securities, in turn, trade on major U.S. stock exchanges like the New York Stock Exchange and NASDAQ as well as OTC markets.

31.    BNYM markets ADRs to U.S. investors as a "convenient and cost effective" way to own shares of foreign companies. Further, BNYM states that ADRs provide a mechanism for U.S. investors to avoid "impediments relating to settlements, currency conversions, custody services, information flow, unfamiliar market practices, tax conventions, and internal investment policies."  BNYM warns that these impediments "may discourage U.S. investors from venturing outside their local market."

32.     BNYM, which currently serves as the depositary bank for nearly 2,700 different ADRs, holds itself out as "the leading depositary bank, with a market share of 58%, for one main reason: we add value to [Depositary Receipt issuers'] DR programs."  As the depositary bank for so many ADRs, BNYM has issued ADRs to many investors, including the Plans and Separately Managed Accounts and Collective Investment Funds.

33.     Although ADRs are bought and sold in USD, from time to time the underlying foreign companies may issue dividends or make other payments (e.g., consideration provided during a merger or distributing proceeds of a sale) in foreign currency to their shareholders (again, "Cash Distributions").  The depositary bank is generally required to convert the Cash Distributions into USD and distribute the funds to the corresponding ADR holders (again, "ADR FX Conversions").  ADR FX Conversions take place through a FX transaction, whereby foreign currency is exchanged for USD at a particular rate available in the currency market.  BNYM controlled all aspects of FX trades relating to the conversion of Cash Distributions—including the price, date, and time of the trade.

34.     Cash Distributions, whether in foreign currency or after conversion to USD, at all times belong to the ADR holder.  In the case of ERISA Plans, Cash Distributions are ERISA Plan assets.

35.     The ownership of these Cash Distributions by the ADR holder is also evident in ADR deposit agreements discussed in paragraph 30 above. Deposit agreements are clear that the dividend and interest payments, as a component of the deposited securities, are the property of each ADR holder. For example, a typical deposit agreement states in part:

> The term "Deposited Securities" as of any time shall mean Shares at such time deposited or deemed to be deposited under this Deposit Agreement and any and all other securities, property and cash received by the Depositary or the Custodian

in respect thereof and at such time held hereunder, subject as to cash to the provisions of Section 4.5 [regarding conversion of foreign currency].

Deposit Agreement between ARM Holdings PLC, The Bank of New York Mellon as Depositary, and Owners and Beneficial Owners of American Depositary Shares, available at

https://www.sec.gov/Archives/edgar/data/1057997/000101915507000341/armdacomptobefiled.htm ("ARM Deposit Agreement") § 1.9.

36.     Plaintiff has identified other deposit agreements for ADRs owned by the Plan involving BNYM-issued ADRs with virtually identical language.[4]  On information and belief, Plaintiff believes and therefore alleges that the BNYM deposit agreements governing the ADRs purchased by the Plans were identical or substantially similar in all material respects.

37.     Pursuant to the deposit agreements, whenever BNYM received Cash Distributions, BNYM was obligated to "convert such dividend or distribution as promptly as practicable into Dollars and . . . distribute as promptly as practicable the amount thus received [net of stated fees] to the Owners entitled thereto."  *See, e.g.,* ARM Deposit Agreement § 4.1; *see also id.* § 4.5; *see also* Deposit Agreements cited in footnote 5, infra.

38.     Deposit agreements typically identify the fees, expenses, and other charges BNYM may assess to ADR owners. *See, e.g., id.* § 5.8.[5] Depositary agreements typically allow BNYM to charge "reasonable expenses as are incurred by the Depositary in the conversion of foreign currency," *id.* (citing to Deposit Agreement § 4.5 regarding conversion of foreign

---

[4] *See, e.g.,* Deposit Agreement between America Movil, S.A. de C.V., the Bank of New York as Depositary, and Owners of American Depositary Receipts, available at https://www.sec.gov/Archives/edgar/data/1129137/000101915505000138/movilldep.htm, § 1.1; Deposit Agreement between Diageo PLC, the Bank of New York Mellon as Depositary, and Owners and Beneficial Owners of American Depositary Shares, available at https://www.sec.gov/Archives/edgar/data/835403/000101915511000077/daigeodep.htm, § 1.10.

[5]  *See also* Deposit Agreements cited in footnote 4, infra.

currency), but they do not authorize BNYM to exercise unbridled discretion in the execution and pricing of ADR FX Conversions.[6]

39.    Defendants generally kept their fictitious prices within the "range of the day," which helped prevent discovery of their acts. Defendants further concealed their breach of duty from their clients by failing to disclose the actual time of the transaction. Since currency prices change throughout the day, and Defendants never disclosed when a given ADR FX transaction occurred, clients could not discover Defendants' improper practices and breaches of fiduciary duty. Defendants' actions ensured that the customers would not discover that the rates reported to them included the excessive, unauthorized markups. Meanwhile, Defendants reaped windfall profits by selecting the worst rate, from the customer's perspective, and using a rate that was advantageous to Defendants.

40.    BNY Mellon Corp.'s global FX operations are currently managed from New York. However, even after the Merger, the separate FX departments that existed before the Merger were maintained. Those custodial clients that previously hired affiliates of the old Bank of New York to be their custodian still had their trades executed by the legacy Bank of New

---

[6] "Section 5.8 Charges of Depositary.  The following charges shall be incurred by any party . . . to whom Receipts are issued (including, without limitation, issuance pursuant to a stock dividend or stock split declared by the Issuer or an exchange regarding the Receipts or Deposited Securities or a distribution of Receipts pursuant to Section 4.3), whichever applicable: (1) taxes and other governmental charges, (2) such registration fees as may from time to time be in effect for the registration of transfers, if any, of Shares generally on the Share register of the Issuer or Foreign Registrar and applicable to transfers of Shares to the name of the Depositary or its nominee or the Custodian or its nominee on the making of depositor withdrawals hereunder, (3) such cable, telex and facsimile transmission expenses as are expressly provided in this Deposit Agreement, (4) such reasonable expenses as are incurred by the Depositary in the conversion of foreign currency pursuant to Section 4.5, (5) a fee of $5.00 or less per 100 American Depositary Shares (or portion thereof) for the execution and delivery of Receipts pursuant to Section 2.3, 4.3 or 4.4, and the surrender of Receipts pursuant to Section 2.5 or 6.2, (6) a fee of $.02 or less per American Depositary Share (or portion thereof) for any cash distribution made pursuant to the Deposit Agreement including, but not limited to, Sections 4.1 through 4.4 hereof and (7) a fee for the distribution of securities pursuant to Section 4.2, such fee being in an amount equal to the fee for the execution and delivery of American Depositary Shares referred to above which would have been charged as a result of the deposit of such securities (for purposes of this clause (7) treating all such securities as if they were Shares), but which are instead distributed by the Depositary to Owners." *Id.*

York FX desk in New York, and those clients that previously hired affiliates of Pittsburgh-based Mellon to be their custodian still have their trades executed by the legacy Mellon FX desk in Pittsburgh.

41.     Since the Merger, at the conclusion of each trading day, a "Reconciliation" call is made between the New York and Pittsburgh Transaction Desks. The Pittsburgh Transaction Desk (*i.e.* legacy Mellon) calls the New York Transaction Desk (*i.e.* legacy Bank of New York), so that they can verify they have selected the same high and low ranges for each currency pair. The telephone calls are made on a private, direct line and may be excepted from the customary policy of recording transactional conversations.

42.     The "Reconciliation" call, done at approximately 2:30 p.m., is made so that any discrepancies between each Transaction Desk's prices can be avoided and discovery of Defendants' pricing scheme made less likely.

**C.     BNYM Has Overcharged Other Customers for FX Services; The Instant ADR FX Conversion Scheme Is Simply Another Example of A Comprehensive Course of Misconduct**

43.     Defendants' ADR FX Conversion scheme is part and parcel of a broader pattern of FX overcharges, concealment of dishonest conduct, and profiteering at the expense of ERISA plans. It was designed to, and did, reap hundreds of millions of dollars in profits while minimizing the risks of detection.

44.     Recent litigation focused on BNYM's "standing instruction" (or "SI") trades, in which BNYM improperly overcharged its ERISA and non-ERISA customers. Defendants considered SI FX trades to be the most profitable form of business because "it offers the traders a free intra-day option to time its currency execution in the marketplace knowing it does not have to get back to the customer immediately with the deal price. Business of this type allows us to

take advantage of increased market volatility and wide intra-day trading ranges." Email from Jorge Rodriguez to Richard Mahoney, Feb. 1, 2008 Re: "the negative impact of e-commerce."

45.     By generally keeping the price charged to its clients within the range of the day, Defendants ensured that their customers would not discover that the SI FX transactions were not being provided as disclosed.

46.     Defendants touted their SI FX pricing structure to clients by stating, "We price at the high and low of the day." According to internal emails, the truth was, "It's the high and low of the day, depending on which one is against you." Email from David Green to James McAuliffe, July 26, 2010, "Re: Follow-up Strategy Session – Standing Instruction Business."

47.     Defendants' FX scheme for implementing standing instruction orders required that Defendants exercise discretion in fulfilling their duties. For standing instruction trades, Defendants exercised discretion as to the time of day that the trades were executed, as well as the amount of any markup or markdown charged to the client. In relevant part, Defendants controlled and set the markups and markdowns and determined; whether they would fall within the range of the day for the currency pair; whether to net trades for buys and sells across clients; whether to minimize markups where Defendants utilized subcustodians for certain currency pairs; and whether to provide discounts for clients with larger accounts for the same or similarly-sized trades of the same currency pairs.

48.     Perpetuation of Defendants' schemes and their attendant high-marginal revenue on non-negotiated and standing instruction trades required withholding from clients critical information about the manner in which the trades were executed and priced.

49.     E-mails make clear that preventing clients from learning Defendants' SI FX pricing scheme was an explicit business strategy. For example, on April 11, 2008 Antonio

Garcia-Meitin of BNY Mellon's Asset Servicing Global Management department sent an e-mail to others in this department titled "Transparency" that stated:

> In general transparency adversely impacts our revenue stream and any product to distribute fee information would hurt us many times over in reduced revenue. Nothing like a rock and a hard place.

(Emphasis added).

50.    Another BNY Mellon officer commented on the idea of greater transparency: "I do NOT like it. Once pricing spreads are disclosed it will be a race to how quickly clients work it down to zero."

51.    For BNY Mellon, the non-negotiated FX portion of its business was referred to internally as the "highest quality, highest margin business." October 15, 2009 email from Jorge Rodriguez to Richard Mahoney, "Non-negotiated FX revenue down $262MM verses [sic] 2008—Details enclosed."

52.    BNYM admits that standing instruction trading is the most profitable form of FX trading for Defendants. It stated that "A shift by custody clients from the standing instruction program to other trading options . . . may negatively impact our foreign exchange revenue." *See, e.g.,* BNY Mellon Corp. Form 10-Q for the quarter ended Mar. 31, 2012 (filed May 9, 2012), p. 8; BNY Mellon Corp. Form 10-Q for the quarter ended Jun. 30, 2012 (filed May 9, 2012), p. 9; BNY Mellon Corp. Form 10-Q for the quarter ended Jun. 30, 2013 (filed Nov. 8, 2013), p. 9.

53.    In a recently settled set of cases, BNYM first admitted that its Global Markets FX desks knowingly charged the Bank's custodial clients unfavorable rates on FX trades done pursuant to standing instructions:

> [BNYM] assigns prices to Standing Instruction Service transactions that ***are at or near the high end*** of the range of prices reported in the interbank market ***for currency purchases*** for the relevant pricing cycle, ***and at or near the low end*** of range of prices reported in the interbank market ***for currency sales*** for the relevant pricing cycle.

*United States v. The Bank of New York Mellon Corp.*, No. 11-cv-06969 (the "DOJ Action"),

Stipulation and Order of Partial Settlement and Dismissal (S.D.N.Y. Jan. 17, 2012) (the "January

17, 2012 Stipulation") (emphasis added).  BNYM agreed to pay $714 million to resolve the DOJ

Action and other actions relating to the Bank's SI FX practices (collectively, the "SI FX

Litigation").

54.     In other words, as the Bank would later admit as part of a final settlement of the

DOJ Action, "***the Bank gave SI clients prices that were at or near the worst interbank rates***

***reported during the trading day or session.***"

55.     And in a Stipulation and Order of Settlement and Dismissal entered on April 23,

2015 in the DOJ Action, BNYM admitted the following:

> Throughout the trading day or session (which could be as long as 24 hours), as
> each custodial client's account generated FX transactions to be executed pursuant
> to SIs, the Bank's practice was to aggregate those FX transactions for all SI
> clients and group them by currency pair.  Near the end of the trading day or
> session, the Bank priced those SI FX trade requests it had received throughout
> that day or session.
>
> To determine the price for each SI FX transaction for most currencies, the Bank
> examined the range of reported interbank rates from the trading day or session
> and assigned the rate on SI trades as follows: if the client was purchasing foreign
> currency, the client received a price at or close to the highest reported interbank
> rate for that day or session (at or near the least favorable interbank price for the
> client reported during the trading day or session), and if the client was selling
> foreign currency, the client received a price at or close to the lowest reported
> interbank rate of the day or session (also at or near the least favorable interbank
> price for the client reported during the trading day or session).
>
> Because SI clients received pricing at or near the high end of the reported
> interbank range for their currency purchases and at or near the low end of the
> reported interbank range for their sales, the Bank was generally buying low from,
> and selling high to, its own clients.  The Bank recorded the difference or "spread"
> between the rates it gave clients and the interbank market price at the time the SI
> transactions were priced as "sales margin."

*United States v. The Bank of New York Mellon and David Nichols*, No. 11-06969, Stipulation

and Order of Settlement and Dismissal (S.D.N.Y. April 23, 2015), ¶¶ 2(b)(i)-(iii).

56.     With only minor differences, BNYM's ADR FX Conversion scheme operated in the same fashion as BNYM's SI FX scheme. During the Class Period, in violation of ERISA, BNYM charged Plaintiffs and the Class unauthorized rates on ADR FX Conversions far in excess of the Bank's actual expenses incurred in executing ADR FX Conversions, and far in excess of the charges permitted by the depositary agreements, thereby reaping improper gains at the direct expense of Plaintiffs and the Class. As further described below, the fact that ADR FX Conversions were priced in a similar manner to SI FX transactions remained hidden until only recently.

57.     On information and belief, throughout the Class Period, rather than charging rates necessary for the ADR FX Conversions in good faith and in a manner that reflected a prompt conversion of Cash Distributions into USD, BNYM utilized the range of FX rates available over a 24-hour (or longer) period (the "session range") in order to charge ADR holders exchange rates that, while within the session range, allowed BNYM to capture a substantial and unauthorized spread between the FX rates charged and the actual rates available to BNYM at the time of the transactions.  BNYM failed to provide ADR FX Conversions at "best execution" prices, the most favorable terms reasonably available under the circumstances, which is the only reasonable defensible price for a fiduciary to charge an ERISA Plan when engaging in self-interested transactions with an ERISA plan's assets. At a minimum, best execution standards require that Defendants execute trades on terms that are no less favorable than those offered to unrelated parties in a comparable arm's-length transaction. In so doing, BNYM breached its fiduciary obligations to Plaintiff and the Class.  As a result of its practice, in violation of ERISA, BNYM improperly skimmed millions of dollars from distributions owed and payable to Plaintiff and the Class.

58.     This activity was in total violation of ERISA's fiduciary obligations.

59.     On or about June 24, 2015, BNYM notified certain investment managers that it had "inadvertently" overcharged certain of its ADR holder clients for ADR FX services. At least one notice stated the following:

> The Bank of New York Mellon (BNY Mellon) is one of the Agents that sponsors American Depository Receipts (ADRs) that are available to UBS clients. Following a recent review, it was determined that BNY Mellon inadvertently charged clients fees on ADRs in which no fees were applicable and/or overcharged them. . . .

The notice was ambiguous to the extent it simply referred to "fees," and may have pertained to any number of specific fees that BNYM disclosed it would assess against ADR holders pursuant to deposit agreements, for example, "a fee of $.02 or less per American Depositary Share (or portion thereof) for any cash distribution made pursuant to the Deposit Agreement." *See* footnote 6, infra. BNYM's June 2015 notice did not admit to or reference in any fashion BNYM's ongoing ADR FX Conversion scheme.

60.     Not until October 1, 2015, did BNYM reveal—for the first time—that it ***employed similar pricing practices when executing ADR FX Conversions*** as it employed when doing SI FX trades when, just one week after final approval was granted to the settlement of class-action proceedings against BNYM for its SI FX practices, BNYM published its Pricing Disclosure on its ADR-devoted webpage.  In this disclosure, BNYM publicly stated for the first time that, notwithstanding whatever language was contained in its ADR Agreements, that it made "***no representations, warranties or guarantees*** as to whether the price or the pricing methodology [it] used to price a [ADR FX Conversion] yields a ***fair market price***."  Specifically, BNYM stated it consistently priced ADR FX Conversions so as to take advantage of the range of market rates available during a particular 24-hour (or in some cases longer) trading session (regardless of when, during that session, the trade was actually priced), with the spreads on such trades

accruing to the Bank as "revenue."  In other words, on that day the Bank disclosed—for the first time—that it used the same "session range" approach to pricing ADR FX Conversions as it used for SI FX transactions.

61.    Upon information and belief, BNYM has earned revenues and profits from its ADR FX Conversion scheme since at least January 1, 1997, meaning BNYM reaped significant, unauthorized revenue throughout the Class Period.

**D.    BNYM's ADR FX Conversion Scheme Violates ERISA and Caused Injury to Plaintiff, the Class, and the Plans**

**1.    The Plans Are Governed by ERISA**

62.    There are two types of ERISA-covered pension plans—defined benefit plans and defined contribution plans. Defined benefit plans are traditional pension plans in which the amount of benefit a participant receives is fixed; defined contribution plans are plans such as 401(k) plans in which participants contribute a portion of their earnings to an account, invest it, and then receive the proceeds upon retirement. Both types of retirement plans have, especially over the last decade, found it necessary and prudent to expand their investments to include foreign securities. Accordingly, defined benefit plans have expanded foreign holdings, and defined contribution plans frequently include at least one, if not several, foreign investment options.

63.    ERISA-covered plans regularly purchase and sell foreign securities in order to increase diversification and take advantage of opportunities for higher returns. ERISA plans that invest in foreign securities receive principal, dividends, and interest that are paid in foreign currencies, or participate in other investments that require the exchange of foreign currency into and from U.S. Dollars, either directly or through participation in Separately Managed Accounts or Collective Investment Funds. As a result, the purchase and sale of currencies incidental to a

22

foreign securities transaction is vital to a plan's participation in the international securities markets and to the acquisition, holding, and disposition of foreign securities.

## 2. Defendants Owe Fiduciary Duties to Plaintiff, the Class, and the Plans

64. Every ERISA plan must have one or more named fiduciaries to administer and manage the plan. ERISA treats as fiduciaries not only persons explicitly named as fiduciaries, but also any other person who in fact performs fiduciary functions. Specifically, under ERISA a person is a fiduciary "to the extent … he exercises any discretionary authority or discretionary control respecting management of such plan *or exercises any authority or control respecting management or disposition of its assets*…." 29 U.S.C. § 1002(21)(A)(i) (emphasis added). Thus, an entity is an ERISA fiduciary if it exercises discretionary authority or control in managing the plan, or, if it exercises any authority or control (discretionary or not) respecting management or disposition of plan assets. Under ERISA, one can be a fiduciary whether or not one would qualify as an agent under the common law.

65. An ERISA fiduciary is required to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and … for the exclusive purpose of … providing benefits to participants and beneficiaries and … defraying the reasonable expenses of administering the plan …." ERISA, 29 U.S.C. § 1104(a)(1)(A)(i), (ii). In common parlance, ERISA fiduciaries owe the duty of loyalty.

66. Defendants and their predecessors in interest are/were fiduciaries under ERISA to the extent they hold/held positions of trust, *i.e.*, fiduciary, custodian, trustee, administrator, etc., for the Plan and other similarly-situated ERISA plans. According to the Plan's annual reports filed with the Department of Labor on Form 5500, and, on information and belief, pursuant to agreements denominated "custody agreements," "trust agreements," or the like, Defendants served as fiduciaries for the Plan.

67.     Defendants and their predecessors in interest are/were fiduciaries under ERISA to the extent they exercise/d any authority or control respecting management or disposition of the Sheet Metal and the other Plans' assets. In addition, Defendants and their predecessors in interest are/were fiduciaries under ERISA to the extent they exercise/d any discretionary authority or discretionary control respecting administration or management of the Plans.

68.     Here, Defendants and their predecessors in interest exercise/d authority and control over the management or disposition of Plan assets because, through the ADR FX scheme described above, they improperly set the rates for the FX transactions at or near the worst rate of the day to maximize Defendants' profit and maximize Plan expenses. Defendants effectively set their own compensation by deciding how much "spread" the Sheet Metal Plan and other Plans would pay the Defendants for each ADR FX Conversion.

69.     Defendants did not disclose the ADR FX Conversion scheme alleged herein to the Sheet Metal Plan or any other of the Plans. Indeed, Defendants intentionally concealed their scheme and intentionally omitted disclosures that would have allowed the Plans to discover the scheme. As a result, any agreements between Defendants and the Plans regarding ADR FX services were not arm's length transactions.

70.     At all times, regardless of any self-serving language in documents drafted by Defendants, Defendants were required to comply with the general fiduciary responsibility provisions of ERISA § 404, 29 U.S.C. § 1104, which require, among other things, that a fiduciary discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan. Furthermore,

Defendants at all times were required to act prudently and consistent with their duty of loyalty to the Plans and the Plans' participants and beneficiaries.

71.     To the extent Defendants or any of their predecessors in interest purport to disclaim liability for breach of fiduciary duty pursuant to any agreement (written or oral), ERISA provides that any such agreement is void as against public policy. 29 U.S.C. § 1110.

**3.     Causation**

72.     As a direct consequence of the misconduct alleged herein, the Plans suffered financial losses and injury in fact for which Plaintiff seeks recovery on behalf of the Plans.

73.     As a result of these financial losses suffered by the Plans, Plaintiff suffered injury in fact.

**4.     Defendants' Fraud or Concealment of its ADR FX Conversion Scheme
        Extends the Applicable Statute of Limitations**

74.     ERISA's statute of limitations provision for fiduciary breach claims provides that "in the case of fraud or concealment, [an] action may be commenced not later than six years after the date of discovery of such breach or violation." 29 U.S.C. § 1113.

75.     Defendants' ADR FX Conversion scheme, as described above, involved intentional concealment sufficient to satisfy ERISA's fraud or concealment limitations period. Plaintiff was not aware of this scheme prior to 2015. Particular instances or evidence of concealment, or Defendants' intentional policy of concealment, include those cited above and below.

76.     To conceal their actions and reap secret profits at the Plans' (and others) expense during the Class Period, Defendants generally failed to report FX conversion rates utilized and never disclosed until late 2015 that it used conversion rates favorable to itself and unfavorable to its clients using "range of the day" spreads.

77.     As discussed above, Defendants' FX pricing scheme was an explicit business strategy.  *See, e.g.,* ¶¶ 49-50.

78.     Defendants' deceptive conduct extended to virtually all of its clients, according to a March 29, 2011 letter from a BNY Mellon employee to the Florida Attorney General. A redacted copy of this letter was obtained through an open records act request by the Wall Street Journal and made public in an article published on December 28, 2011. The author, who worked closely with BNYM executives Rodriguez and Mahoney, said:

> I was also trained in committing fraud using various strategies [] to the bank's corporate foreign exchange clients....I can tell you firsthand and without any hesitation that the fraud is prevalent throughout BNY Mellon's Foreign Exchange Group. I can also share with you that top management was aware of the fraud the entire time....BNY Mellon's foreign exchange group was very small. I was only 1 of 3 people in the entire bank who focused exclusively on the corporate client segment. We used the same systems and fraudulent strategies on the corporate clients as was used on the pension fund clients.

79.     Plaintiff expects to uncover further evidence of Defendants' concealment as discovery proceeds.

## IV.     CLASS ALLEGATIONS

80.     **Class Definition.** Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(1), (b)(2), and, in the alternative, (b)(3) on behalf of the following class:

> All participants, beneficiaries, and named fiduciaries of ERISA Plans that held Defendant-sponsored ADRs involving ADR FX Conversion transactions (a) for which Plans Defendants (or their affiliates or predecessors in interest) served as trustee or custodian of assets (including serving as trustee or custodian for Collective Investment Funds or Separately Managed Accounts in which the Plans invested); (b) for which Plans Defendants (or their affiliates or predecessors in interest) engaged in ADR FX Conversion transactions using assets of Plans; or (c) for which Plans Defendants established how much Defendants would earn from ADR FX Conversion transactions (including foreign currency transactional services provided to Collective Investment Funds or Separately Managed Accounts that held the Plans' assets), at any time from January 12, 1997 to the present. Excluded from the Class are any officers, directors, affiliates, legal

representatives, heirs, successors, subsidiaries, and/or assigns of the Defendants or any of their respective predecessors in interest or any entity in which any Defendant or any of their respective predecessors in interest have a controlling interest.

81.     Class treatment is appropriate in this case because it would promote judicial economy by adjudicating Plaintiff's ERISA claims with respect to all Class members.

82.     **Numerosity.** The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff and can only be ascertained through appropriate discovery, Plaintiff believes that hundreds of ERISA plans with thousands of participants[7] and beneficiaries throughout the country sustained losses because of Defendants' unlawful ADR FX Conversion scheme.

83.     **Commonality.** The claims of Plaintiff and all Class members originate from the same violations of ERISA perpetrated by Defendants with regard to their ADR FX Conversion trading scheme. The questions of law and fact common to Plaintiff and all members of the Class include, but are not limited to:

A.     Whether Defendants breached their fiduciary duties of prudence and loyalty by using an ADR FX Conversion trading scheme to improperly manipulate ADR FX Conversion transactions;

B.     Whether Defendants' self-dealing ADR FX Conversion transactions constituted transactions prohibited by ERISA;

C.     Whether Defendants are ERISA fiduciaries;

D.     Whether Defendants' fiduciary breaches caused losses to Plaintiff, the Class, and the Plans; and

---

[7] In 2009, the Plan had more than 140,000 participants.

27

E. Whether Defendants' prohibited transactions caused losses to Plaintiff, the Class, and the Plans.

84. **Typicality.** Plaintiff's claims for the benefit of the Plan are not only typical of, but the same as, his claims on behalf of the members of the Class for the benefit of the other Plans. Individual cases would require each Class member to prove the same claims based upon the same conduct of the Defendants, using the same legal theories, and would be seeking the same relief.

85. **Adequacy.** Plaintiff will fairly and adequately protect the interests of Class members. Plaintiff has no interests antagonistic to, or in conflict with, those of the Class. Plaintiff will vigorously protect the interests of absent Class members.

86. Plaintiff has retained counsel the law firm of Keller Rohrback L.L.P., whose attorneys are competent and have extensive experience in class action and ERISA litigation.

87. **Rule 23(b)(1)(A) & (B) Requirements.** Class action status is warranted under Federal Rule of Civil Procedure 23(b)(1)(A) because prosecution of separate actions by Class members would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B), because prosecution of separate actions by Class members would create a risk of adjudications with respect to individual Class members that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

88. **Rule 23(b)(2) Requirements.** Certification under Rule 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other equitable relief with respect to

the Class as a whole. No plan-by-plan inquiry would be required to determine whether Defendants' breached their fiduciary duties.

89.     **Rule 23(b)(3) Requirements.** In the alternative, certification under Rule 23(b)(3) is appropriate because questions of law or fact common to Class members predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

## V.     CLAIMS FOR RELIEF

### COUNT I

### Breach of Duties of Prudence and Loyalty

### (Violation of ERISA, 29 U.S.C. § 1104 by All Defendants)

90.     All previous averments are incorporated herein.

91.     At all relevant times, the Defendants were fiduciaries of the Plans within the meaning of ERISA, 29 U.S.C. § 1002(21)(A).

92.     Defendants were custodians or trustees of the Plans, making them fiduciaries to the extent of their duties and conduct as such.

93.     Defendants were fiduciaries of the Plans to the extent they exercised discretionary authority or control with respect to management of the Plans or exercised authority or control with respect to management or disposition of the Plans' assets when they engaged in ADR FX Conversions as alleged herein.  Defendants determined the price at which it executed the ADR FX Conversions – the price Plans would be required to pay for the transactions – and thereby determined the amount of Defendants' compensation. Defendants exercised pricing discretion based upon such factors as defining the day's spot rate range, pricing large versus small trades, and whether or not to net transactions, and ignored more favorable rates available and provided to others for comparable trades.

94.     Defendants breached their ERISA fiduciary duties of prudence and loyalty, 29

U.S.C. § 1104(a)(1)(A), (B), when executing ADR FX Conversion transactions for the Plans

and/or with the Plans' assets by, inter alia:

A.      Charging the Plans (or the Collective Investment Funds or Separately

Managed Accounts in which the Plans invested) improper rates for ADR FX Conversions

that resulted in excessive and windfall profits for Defendants;

B.      Charging the Plans (or the Collective Investment Funds or Separately

Managed Accounts in which the Plans invested) improper and excessive rates for ADR

FX Conversions that were far in excess of what fully informed parties agree to for

comparable transactions in an arm's-length bargain;

C.      Failing to disclose to the Plans, their fiduciaries, or participants that, in

engaging in ADR FX Conversions for the Plans, Defendants were setting their own

compensation for said transactions and charging the Plans much higher rates than what

parties agree to when bargaining at arm's-length;

D.      Failing to disclose to the Plans, their fiduciaries, or participants that

Defendants intended to act exclusively for their own benefit and as principals when

conducting ADR FX Conversions;

E.      Failing to provide full and frank disclosure to the Plans, their fiduciaries,

or participants of the ADR FX Conversion rates and the ADR scheme;

F.      Failing to provide the Plans, their fiduciaries, or participants with material

information about the actual periodic and daily ADR FX currency ranges that would

enable the Plans to determine the reasonableness of Defendants' ADR FX Conversion

charges;

G.      Failing to disclose to, and concealing from the Plans, their fiduciaries, or participants information showing the more favorable pricing charged by FX traders at other banks for the same services in comparable arm's-length transactions; and

H.      Appropriating the Plans' assets for Defendants' own benefit, and reducing the Plans' assets and the retirement savings of their participants by tens of millions of dollars.

95.     Defendants committed these breaches during each ADR FX Conversion involving assets of the Plans.

96.     As a direct and proximate result of these breaches of fiduciary duty, the Plans and their participants suffered tens of millions of dollars of losses. Moreover, for the defined benefit plans in the Class, these losses increased the risk of non-payment of future benefits to participants.  For the defined contribution plans in the Class, Defendants' ADR FX scheme resulted in immediate loss to the participants' individual accounts.

97.     Pursuant to ERISA, the Defendants are liable to restore all losses suffered by the Plans caused by the Defendants' breaches of fiduciary duty and to disgorge the profits obtained from the ADR FX scheme.

## COUNT II

### Engaging in Self-Interested Prohibited Transactions with Plan Assets

### (Violation of ERISA, 29 U.S.C. § 1106(b) by All Defendants)

98.     All previous averments are incorporated herein.

99.     ERISA prohibits fiduciaries from engaging in certain transactions for which it imposes strict liability for any losses that result. Specifically, "a fiduciary with respect to a plan shall not . . . deal with the assets of the plan in his own interest or for his own account. . . ." 29 U.S.C. § 1106(b).

100.    The Defendants, all fiduciaries of the Plans, committed prohibited transactions in that they dealt with the Plans' assets for their own interests and for their own accounts in executing ADR FX Conversions for the Plans.  In addition, they appropriated from the Plans' assets millions of dollars in payments for themselves resulting from improper rates applied to ADR FX Conversions, enriching themselves at the expense of the Plans and their participants.

101.    As a direct and proximate result of these prohibited transactions, the Plans, directly or indirectly, paid millions of dollars and received millions of dollars less for ADR FX Conversions that were prohibited by ERISA.

102.    The terms of the ADR FX Conversions set by Defendants were less favorable to the Plans than terms generally available in comparable arm's-length ADR FX transactions between unrelated parties.

103.    As a direct and proximate result of these prohibited transactions, the Plans and their participants suffered tens of millions of dollars of losses. Moreover, for the defined benefit plans in the ERISA Subclass, such as the Sheet Metal Plan, these losses increased the risk of non-payment of future benefits to participants.  For the defined contribution plans in the ERISA Subclass, Defendants' ADR FX scheme resulted in immediate loss to the participants' individual accounts.

104.    Pursuant to ERISA, Defendants must disgorge all fees paid them for the Plans' FX transactions, restore all losses suffered by the Plans from the prohibited transactions, and disgorge all profits earned on the amounts paid by the Plans to Defendants.

## COUNT III

### Causing the Plans to Engage in Party in Interest Prohibited Transactions

### (Violation of ERISA, 29 U.S.C. § 1106(a) by All Defendants)

105.    All previous averments are incorporated herein.

106.     This claim is pled in the alternative to Count II.

107.     ERISA prohibits fiduciaries from causing a plan to engage in certain transactions with parties in interest with respect to a plan, specifically:

108.     A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –

(A) sale or exchange, or leasing, of any property between the plan and a party in interest; [or],

* * * *

(D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan[.]

29 U.S.C. § 1106(a)(1).

109.     A party in interest with respect to a plan includes "any fiduciary (including, but not limited to, any administrator, officer, trustee, or custodian)" as well as "a person providing services to such plan . . . ." 29 U.S.C. §1002(14)(A) & (B).

110.     The Defendants, through their ADR FX scheme, caused certain of Defendants' divisions, departments, affiliates and/or subsidiaries, which are parties in interest with respect to the Plans, to engage in ADR FX trades with the Plans that resulted in higher profits for Defendants and higher expenses and/or lower returns for the Plans. These trades constituted an exchange of property and/or transfer of assets between parties in interest and the Plans, and are thus prohibited by ERISA. Plaintiffs make this allegation to the best of their knowledge, information, and belief, formed after an inquiry reasonable under the circumstances; this allegation is not being presented for any improper purpose; this allegation is warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; and the factual contentions in this allegation will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

111.    As a direct and proximate result of these prohibited transactions, the Plans and their participants suffered tens of millions of dollars of losses. Moreover, for the defined benefit plans in the ERISA Subclass, including the Sheet Metal Plan, these losses increased the risk of non-payment of future benefits to participants.  For the defined contribution plans in the ERISA Subclass, Defendants' ADR FX scheme resulted in immediate loss to the participants' individual accounts.

112.     Pursuant to ERISA, Defendants must disgorge all fees paid them for the Plans' ADR FX Conversions, restore all losses suffered by the Plans from the prohibited transactions, and disgorge all profits earned on the fees paid by the Plans to Defendants.

## VI.    JURY DEMAND

113.    Plaintiff demands a trial by a jury of six (6) persons as to all claims triable by jury.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

114.    Declare that Defendants are fiduciaries of Plaintiff, the Class members and the Plans.

115.    Declare that the Defendants breached their fiduciary duties under ERISA;

116.    Declare that the Defendants have violated ERISA's prohibited transactions provisions;

117.    Issue an order compelling a proper accounting of the FX transactions in which Defendants have engaged for the Plans ;

118.    Issue an order compelling Defendants to restore all losses caused to the Plans (or that will be caused to the Plans after the filing of this Complaint), including lost investment returns on money that would have been invested but for Defendants' illegal conduct;

119.     Issue an order compelling the Defendants to disgorge all fees paid or incurred by the Plans (or that will be paid or incurred by the Plans after the filing of this Complaint), including any profits thereon;

120.     Award surcharge, equitable restitution, and other appropriate equitable monetary relief against the Defendants;

121.     Award such other equitable or remedial relief as may be appropriate, including the permanent removal of the Defendants from any positions of trust with respect to the Plans and the appointment of independent fiduciaries to select or serve as custodian or trustee to the Plans;

122.     Order that this action be certified as a class action and that a constructive trust be established for distribution to the extent required by law;

123.     Enjoin Defendants collectively, and each of them individually, from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

124.     Award Plaintiff attorneys' fees and costs pursuant to ERISA, 29 U.S.C. § 1132(g) and/or the Common Fund doctrine; and

125.     Award such other and further relief as the Court deems equitable and just.

DATED:     January 12, 2016           Respectfully submitted,

                                           KELLER ROHRBACK L.L.P.


By  /s/ David S. Preminger
     David S. Preminger
     dpreminger@kellerrohrback.com
     1140 Avenue of the Americas, 9th Floor
     New York, NY 10036
     Telephone:  (646) 380-6690
     Facsimile:  (646) 380-6692

     Lynn Lincoln Sarko
     T. David Copley
     Elizabeth A. Leland
     KELLER ROHRBACK L.L.P.
     1201 Third Avenue, Suite 3200
     Seattle, WA 98101
     Telephone: (206) 623-1900
     Facsimile: (206) 623-8986
     lsarko@kellerrohrback.com
     dcopley@kellerrohrback.com
     bleland@kellerrohrback.com

     ***Attorneys for Plaintiff and the Class***